This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-36704

**RICARDO CARRILLO,**

Plaintiff-Appellee,

v.

**COPPER SOLUTIONS AND SERVICES, LLC; CECILIO DURAN MEDINA; and GEORGE C. ALDERETE,**

Defendants-Appellants,

**and**

**MARTIN GARCIA; BONNIE DUTRAM; and MISS BONNIE'S PDQ ESCORT SERVICES, LLC,**

Defendants.

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY**
**Matthew J. Sandoval, Jr., District Judge**

Wray & Girard P.C.
Katherine Wray
Albuquerque, NM

Peifer, Hanson & Mullins, P.A.
Lauren Keefe
Albuquerque, NM

Martinez Law Office
W. Ken Martinez
Camille Martinez-Olguin
Grants, NM

Tandy Hunt P.C.
Tandy Hunt
Hannah Bell
Jessica Thompson
Roswell, NM

for Appellee

Keleher & McLeod, P.A.
Thomas C. Bird
Kurt Wihl
Justin B. Breen
Albuquerque, NM

for Appellants Copper Solutions and Services, LLC and Cecilio Duran Medina

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward Ricco
Albuquerque, NM

for Appellant George C. Alderete

## MEMORANDUM OPINION

**BOGARDUS, Judge.**

**{1}** Cecilio Duran Medina, George C. Alderete, and Copper Solutions Services, LLC (collectively, the Copper Solutions Defendants) appeal from a jury verdict that awarded both compensatory and punitive damages to Ricardo Carrillo (Plaintiff). Between them, they raise challenges to jury instructions, the admission of expert testimony, the admission of documentary evidence, and the punitive damages award. We reverse the punitive damages award against Medina and otherwise affirm.

## BACKGROUND

**{2}** Because this is a memorandum opinion and the parties are familiar with the facts and procedural history of this case, we set forth here only a brief overview of the historical facts of this case. We reserve discussion of specific facts where necessary to our analysis.

**{3}** On November 2, 2011, Medina was driving west on State Road 529[1] between Hobbs and Artesia, New Mexico, in a semi-truck with a flatbed trailer that was owned by Copper Solutions, which in turn was owned by Alderete. Immediately after coming out of

---

1During trial, State Road 529 was known by a nickname of "highway to hell" by one witness and was described by others as a small, narrow two-lane road that has lots of traffic. The road was also described by witnesses as particularly busy in the mornings.

a curve in the roadway, Medina rear ended a pickup truck driven by Martin Garcia that was either stopped in the roadway or was traveling very slowly. The pickup truck driven by Garcia was owned by Miss Bonnie's PDQ Escort Service, LLC, which in turn was owned by Bonnie Dutram. Following this collision, the pickup truck driven by Garcia crossed the center line, traveled through the eastbound lane, and eventually rolled over. The semi-truck driven by Medina also crossed the center lane, resulting in a head-on collision with Plaintiff's semi-truck with a tank trailer that was traveling east on State Road 529. Both Plaintiff and Medina were injured in that collision and were airlifted from the scene.

**{4}** Plaintiff filed a complaint seeking both compensatory and punitive damages against two groups: (1) the Copper Solutions Defendants; and (2) the PDQ Defendants, which consisted of Garcia, Dutram, and Miss Bonnie's PDQ Escort Service, LLC. The parties engaged in extensive litigation before the matter proceeded to trial. During the nine day trial, the jury heard from numerous witnesses, including eyewitnesses, experts in accident reconstruction, and medical experts.

**{5}** The jury awarded Plaintiff $7,000,000 in compensatory damages and apportioned fault as follows: (1) twenty percent to Medina; (2) fifteen percent to Alderete; (3) fifteen percent to Copper Solutions; (4) twenty percent to Garcia; (5) fifteen percent to Dutram; and (6) fifteen percent to Miss Bonnie's PDQ Escort Service, LLC. The jury also awarded punitive damages in the following amounts: (1) $3,000,000 against Medina; (2) $6,000,000 against Alderete and Copper Solutions; (3) $3,000,000 against Garcia; and (4) $6,000,000 against Dutram and Miss Bonnie's PDQ Escort Service, LLC. The district court entered separate judgments against the Copper Solutions Defendants and the PDQ Defendants. The PDQ Defendants settled following the entry of judgment against them and are not party to this appeal. The Copper Solutions Defendants appeal.

## DISCUSSION

### I. The Jury Instructions Regarding Alderete, When Viewed as a Whole, Were Sufficient

**{6}** Alderete challenges the UJI 13-302B NMRA (13-302B instruction) that was given, arguing that that it failed "to focus on the elements of liability or distinguish adequately among the various claims of negligence against" the Copper Solutions Defendants. Alderete further contends that those failures allowed the jury to find liability on his part "without ever actually finding that [he] was negligent or that he had engaged in conduct causally related to the accident." Alderete contends that the problem created by those failures was compounded by the district court's "erroneous application of the negligence per se doctrine to Medina's violation of two motor vehicle statutes."[2] In relevant part, the 13-302B instruction given to the jury provided as follows:

2Plaintiff contends that Alderete failed to preserve his challenge to the 13-302B instruction because Alderete did not tender a correct instruction. However, "[a] proper instruction is only required in case of a failure to instruct on

To establish negligence on the part of Defendants[,] Mr. Carrillo has the burden of proving at least one of the following:

With regard to Defendants Cecilio Medina, George Alderete and Copper Solution[s] and Services, LLC:

12. Driver Medina failed to keep a proper lookout and carelessly operated the semi[-]truck.

13. Driver Medina failed to keep a proper lookout and followed Miss Bonnie PDQ['s] red truck too closely.

14. Defendant Medina drove the semi[-]truck left of center on [State Road] 529.

15. Defendant George Alderete allowed an out of service vehicle to be operated on the roads of New Mexico.

16. Defendant[s] George Alderete and Copper Solutions failed to properly qualify and drug test Defendant driver Medina [who] was allowed to operate the semi[-]truck on New Mexico [S]tate [R]oad 529 before and . . . after the crash with Mr. Carrillo.

The [c]ourt has determined that Mr. Medina was guilty of following too closely and careless driving. The [c]ourt has also determined that Defendant Copper Solutions and Services is responsible for the careless driving and following too closely of Defendant Medina.

**{7}** We review Alderete's challenges to the 13-302B instruction and the application of negligence per se de novo. *Benavidez v. City of Gallup*, 2007-NMSC-026, ¶ 19, 141 N.M. 808, 161 P.3d 853. "Jury instructions are sufficient if, when read as a whole, they fairly present the issues and the applicable law." *Vigil v. Miners Colfax Med. Ctr.*, 1994-NMCA-054, ¶ 21, 117 N.M. 665, 875 P.2d 1096. For the reasons that follow, we conclude that the jury instructions regarding Alderete when read as a whole are sufficient.

**{8}** Alderete's argument concerning the 13-302B instruction and the application of negligence per se fails to account for the other instructions that were also given to the jury. While the 13-302B instruction contained five theories of the Copper Solutions Defendants' alleged negligence—two of which pertained specifically to the conduct of Alderete—the jury also received a special verdict form that required it to answer a series

---

any point of law." *Ettenson v. Burke*, 2001-NMCA-003, ¶ 29, 130 N.M. 67, 17 P.3d 440 (internal quotation marks and citation omitted). Accordingly, Alderete's objections to the tendered instruction were sufficient to preserve this issue for review. *See* Rule 1-051(I) NMRA ("For the preservation of any error in the charge, objection must be made to any instruction given, whether in UJI Civil or not; or, in case of a failure to instruct on any point of law, a correct instruction must be tendered, before retirement of the jury.").

of questions about the Copper Solutions Defendants. Those questions narrowed the theories of negligence against Copper Solutions and Alderete to just one—whether Copper Solutions or Alderete were negligent in their training and supervision of Medina.

**{9}** On the special verdict, the jury answered "yes" when asked whether Copper Solutions or Alderete were negligent in their training and supervision of Medina. The jury also answered "yes" on the special verdict form when asked whether any negligence of Copper Solutions or Alderete was a cause of Plaintiff's injuries. The jury then allocated fault, assigning fifteen percent to Copper Solutions *and* fifteen percent to Alderete. The allocation of fault to Alderete is especially significant because the special verdict form gave the jury the option of finding that his percentage of fault was zero if it found either "that [he] was not negligent or that any negligence on the part of [Alderete] was not a proximate cause of damage." We conclude that the jury's answers to the questions on the special verdict form, considered together, indicate that the jury found Alderete's training and supervision of Medina to be a negligent cause of Plaintiff's injuries. Finally, nothing in the jury's answers to the questions posed on the special verdict form indicate that the jury relied on any other theory of negligence asserted against Alderete or that they relied on a theory asserted against Copper Solutions or Medina when determining Alderete's liability. For these reasons, we conclude that the jury instructions, when read as a whole, fairly presented the issues and the applicable law as relevant to the claims against Alderete. *See Vigil*, 1994-NMCA-054, ¶ 21.

## II. Alderete Has Not Demonstrated That He Was Prejudiced by Any Error in the Admission of Dr. Brian Norkiewicz's Testimony

**{10}** At trial, Plaintiff offered expert testimony from Dr. Norkiewicz to prove the reasonableness and necessity of Plaintiff's past and future medical expenses. When Dr. Norkiewicz offered such opinions, he discussed both future surgery expenses and future medication expenses. Alderete argues that "Dr. Norkiewicz's testimony regarding the reasonableness of future medical expenses should not have been admitted to the extent [that] the testimony simply adopted the opinions of non-testifying experts contained in the [independent medical examination] report."[3] We note that the portions of Dr. Norkiewicz's testimony challenged by Alderete relate only to his testimony regarding future surgical expenses and not his testimony concerning future medication expenses. Therefore, we limit our analysis accordingly.

**{11}** "Generally, the district court's rulings as to admissibility of expert testimony are reviewed for an abuse of discretion." *Christopherson v. St. Vincent Hosp.*, 2016-NMCA-097, ¶ 47, 384 P.3d 1098.

---

3The quoted language comes from Alderete's reply brief and is followed by a notation that it "is the extent of this issue on appeal." In his brief in chief, Alderete had also argued that Dr. Norkiewicz's testimony constituted hearsay and that Dr. Norkiewicz was improperly qualified as an expert. Because those arguments were not advanced in the reply brief, we deem them to be abandoned. Nevertheless, even if these arguments were not abandoned, we would decline to review them as the arguments are conclusory and undeveloped. *See Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701 ("This Court has no duty to review an argument that is not adequately developed.").

An abuse of discretion standard of review, however, is not tantamount to rubber-stamping the trial judge's decision, and we are not prevented from conducting a meaningful analysis of the admission of the expert testimony to ensure that the trial judge's decision was in accordance with the [r]ules of [e]vidence and the evidence in the case.

*Loper v. JMAR*, 2013-NMCA-098, ¶ 18, 311 P.3d 1184 (internal quotation marks and citation omitted). "Finally, we observe that in light of the liberal approach of our rules of evidence to the admission of evidence and the heightened qualifications of modern day jurors, any doubt regarding the admissibility of expert opinion evidence should be resolved in favor of admission, rather than exclusion." *Id.* (internal quotation marks and citation omitted).

**{12}**     As an initial matter, we note that nowhere in his briefing does Alderete direct us to the location of the independent medical examination report in the record proper or stipulated supplemental record. *See Muse v. Muse*, 2009-NMCA-003, ¶ 42, 145 N.M. 451, 200 P.3d 104 ("We are not obligated to search the record on a party's behalf to locate support for propositions a party advances or representations of counsel as to what occurred in the proceedings."); *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 65, 146 N.M. 853, 215 P.3d 791 ("It is the duty of the appellant to provide a record adequate to review the issues on appeal."). Although there are general references to the independent medical examination report contained in Alderete's briefing, the specific contents are not described in either his brief in chief or reply brief. These deficiencies deprive us of the opportunity to consider the extent to which Dr. Norkiewicz "simply adopted" the opinions contained in that report as Alderete asserts. Nevertheless, even if we were to assume that the district court erred in admitting Dr. Norkiewicz's testimony, we are not persuaded that any prejudice resulted for the reasons that follow. *See Kennedy v. Dexter Consol. Sch.*, 2000-NMSC-025, ¶ 26, 129 N.M. 436, 10 P.3d 115 ("In civil litigation, error is not grounds for setting aside a verdict unless it is 'inconsistent with substantial justice' or 'affect[s] the substantial rights of the parties.' " (quoting Rule 1-061 NMRA)).

**{13}**     First, Dr. Norkiewicz's opinions did not go unchallenged. Following his testimony on future surgical expenses, Dr. Norkiewicz's opinions were subjected to vigorous cross-examination by counsel for each of the Defendants. During his cross-examination, Dr. Norkiewicz conceded, among other things, that (1) he was unable to predict when the left ankle surgery and right knee replacement would be necessary; (2) he could not state to a reasonable degree of medical probability that Plaintiff would need both a knee revision and knee fusion on the same knee; (3) he could not state to a reasonable degree of medical probability that Plaintiff would have infections associated with future surgery; (4) his review was limited to his own medical records regarding Plaintiff's two visits with him and the information contained in the medical examination report;[4] (5) his

---

4Dr. Norkiewicz's testimony is unclear here as to whether the independent medical examination report contains medical records. We are unable to determine whether or not it does because the independent medical examination report is not part of the record proper or stipulated supplemental record. *See Sandoval*, 2009-NMCA-095, ¶ 65 ("It is the duty of the appellant to provide a record adequate to review the issues on appeal.").

training and experience did not allow him to know what constituted reasonable and customary charges for medical care in New Mexico or Texas outside of his area of expertise; (6) he was not given the medical records that correlated to the medical bills provided to him; (7) he was not able to determine whether at least one of the medical bills provided to him was reasonable and necessary because it did not identify what the charges were for; and (8) at least some of the affidavits from the medical bill custodians did not indicate that the charges were reasonable and necessary. That cross-examination testimony provided a reasonable basis for the jury to reject, in whole or in part, Dr. Norkiewicz's testimony regarding future surgical expenses.

**{14}** Second, Dr. John Allen, who was retained by the Copper Solutions Defendants in this matter, directly contradicted Dr. Norkiewicz's testimony. Dr. Allen testified that Plaintiff did not need (1) a third left knee replacement; (2) a left knee fusion; (3) a right knee replacement or fusion; (4) a left ankle replacement; (5) a right ankle replacement; or (6) a back surgery and, even if he did, it would not be related to the collision. Those opinions conflicted with the testimony provided by Dr. Norkiewicz and provided the jury with another reasonable basis to reject, in whole or in part, Dr. Norkiewicz's testimony regarding future surgical expenses.

**{15}** The jury returned a general verdict of $7,000,000 in compensatory damages, and the special verdict form did not ask the jury to itemize specific dollar amounts for each category of damages. Therefore, the question of whether the jury credited any of Dr. Norkiewicz's testimony regarding future surgical expenses and awarded damages for future surgeries cannot be discerned from the record. Thus, based on the lack of detail regarding which categories of damages the jury included in its award and the fact that the jury was presented with evidence that called Dr. Norkiewicz's opinions into question, we are unpersuaded that Alderete demonstrated any prejudice from the admission of Dr. Norkiewicz's testimony concerning future surgical expenses.

## III. The District Court's Admission of the Letter Written by Alderete

**{16}** Over the Copper Solutions Defendants' objection, the district court admitted a letter written by Alderete (the Letter). The Letter, which was dated approximately four months after the collision, provided as follows:

> To whom it may concern,
>
> This is a letter stating that we have talked to our driver Cecilio Medina about his wreck. We talked to him and asked him what might have caused him to be driving recklessly. He stated that he does not remember what happened and that he thought maybe he had blacked out. Since he stated that he did not remember anything we sent him to be checked out by a Doctor [sic] to see if there was a medical reason for him to have blacked out.
>
> We discussed with him that one of the consequences of wreck less [sic] driving will cause his points to raise on his Commercial Driving License [sic].

> He [sic] discussed with him that he is on a 6 month probation and that if he was to get another serious violation that he will be terminated.
>
> Attached is the Judgment & Sentence by the State of New Mexico and the Reports from the Doctors [sic] office.

The Letter was signed by Alderete, Medina, and a witness. The Letter, as admitted, did not contain the attachments it referenced.

**{17}** In this appeal, all of the Copper Solutions Defendants raise numerous challenges to the district court's admission of the Letter. We begin by setting forth our standard of review and then address each challenge in turn.

## A.   Standard of Review

**{18}** "Admission or exclusion of evidence is a matter within the discretion of the [district] court and the court's determination will not be disturbed on appeal in the absence of a clear abuse of that discretion." *Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 36, 127 N.M. 47, 976 P.2d 999 (internal quotation marks and citation omitted). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the [district] court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *Ruiz v. Vigil-Giron*, 2008-NMSC-063, ¶ 7, 145 N.M. 280, 196 P.3d 1286 (internal quotation marks and citation omitted).

## B.   The District Court Did Not Abuse Its Discretion Under Rule 11-407 NMRA

**{19}** The Copper Solutions Defendants argue that the letter should have been excluded under Rule 11-407 as a subsequent remedial measure. Generally, under Rule 11-407, "evidence of subsequent remedial measures is inadmissible to prove negligence." *Cumming v. Nielson's, Inc.*, 1988-NMCA-095, ¶ 33, 108 N.M. 198, 769 P.2d 732. In relevant part, Rule 11-407 provides that "[w]hen measures are taken by a defendant that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove the following: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction." "One of the basic purposes of [Rule] 11-407 is to encourage a party to initiate and implement steps to promote safety by removing the disincentive to [do so], which would otherwise exist if the accident victim could readily introduce evidence of such changes as evidence of a defendant's negligence." *Yardman v. San Juan Downs, Inc.*, 1995-NMCA-106, ¶ 22, 120 N.M. 751, 906 P.2d 742.

**{20}** The Copper Solutions Defendants rely on federal and out-of-state authority to support the proposition that post-occurrence disciplinary action by an employer can be excluded as a subsequent remedial measure. However, all of the federal authority cited by the Copper Solutions Defendants is either distinguishable or unpersuasive because the cited authority analyzes a district court's exclusion rather than admission of the

evidence for an abuse of discretion, fails to discuss the excluded evidence in detail, applies the applicable rule in conclusory fashion, or involves distinguishable facts.[5] Unlike the cited federal authorities, however, the out-of-state case cited by the Copper Solutions Defendants, *Bullock v. BNSF Ry. Co.*, 399 P.3d 148 (Kan. 2017), does evaluate a district court's admission of evidence and discusses the evidence itself and the applicable rule in detail. However, as we explain below, its facts significantly differ from the facts of this case, making it inapplicable to our analysis.

**{21}** In *Bullock*, the district court admitted, over the objection of the plaintiff's employer, evidence that the plaintiff's coworker had been subjected to a disciplinary process. *Id.* at 152-53. The Kansas Court of Appeals reversed the district court, holding that admission of the evidence of the coworker's discipline was barred as a subsequent remedial measure. *Id.* at 153. The Kansas Supreme Court affirmed the Court of Appeals' decision regarding the admission of the discipline evidence and remanded for a new trial. *Id.* at 153-57.

**{22}** The admitted evidence in *Bullock* included a letter in which the plaintiff's coworker "acknowledged accountability" for the circumstances that led to the plaintiff's injuries and accepted the discipline process. *Id.* at 152 (internal quotation marks omitted). The letter also "outlined the disciplinary details, including a requirement that he 'accept full responsibility' because his actions were in 'clear violation' of rules and his 'failure to clean up the residual fuel contributed to the injury of a fellow worker.' " *Id.* The letter further required that the coworker work with his supervisor "to create an alternative handling plan [after his handling led to the plaintiff's injury] and encouraged [the coworker] to make this a 'learning experience that will help eliminate at risk behavior and prevent future accidents.' " *Id.* The admitted evidence also included an email drafted by the coworker's supervisor that contained a script that the coworker "was required to read to his fellow employees" as part of the disciplinary process. *Id.* at 152-53. The script required the coworker to admit that his "negligence contributed to an injury to another employee." *Id.* at 153 (internal quotation marks omitted). The script further provided that "[i]n the future, it is my hope that each employee remembers this statement, and by my speaking to you today, will help draw attention to the need to protect yourselves and your coworkers against slip, trip and fall hazards." *Id.* (internal quotation marks omitted).

**{23}** The *Bullock* letter required the coworker to take responsibility for the circumstances that led to the plaintiff's injuries, acknowledge his violation of rules, and formulate a plan to better handle the materials that were involved in causing the

---

5*See Specht v. Jensen*, 863 F.2d 700, 701-02 (10th Cir. 1988) (reviewing the district court's exclusion of evidence for an abuse of discretion without describing the excluded evidence with detail); *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir. 1986) (reviewing the district court's exclusion of evidence for an abuse of discretion while applying the relevant rule in conclusory fashion); *Hochen v. Bobst Grp., Inc*., 193 F.R.D. 22, 24 (D. Mass. 2000) (concluding that evidence that an employee had been discharged or been required to undergo additional safety training would fall within the exclusion of subsequent remedial measures); *Wanke v. Lynn's Transp. Co*., 836 F. Supp. 587, 595 (N.D. Ind. 1993) (granting the exclusion of evidence of a dismissal as a subsequent remedial measure).

plaintiff's injuries. The *Bullock* script brought awareness not only to the coworker but also to his fellow employees of the hazard the coworker's conduct created. It is clear that these measures were aimed at preventing similar injuries in the future. Stated another way, had the measures taken after the incident been taken previously, they "would have made an earlier injury or harm less likely to occur." Rule 11-407. By contrast, the first paragraph of the Letter at issue here simply identifies the investigation Copper Solutions had undertaken into the cause of the accident—speaking to Medina and having a doctor evaluate him. Although the Letter indicates that Medina was disciplined, the discipline given—probation and a threat of termination for another serious violation—is a nonspecific warning that simply reiterated something that Medina should have already known before the collision: A serious violation could result in termination. Furthermore, unlike the discipline in *Bullock*, the imposed discipline here did not require any additional training or supervision or appear to apply in a manner that would tend to prevent future injuries. For these reasons, we do not see how the imposed discipline would have made the injury here less likely to occur, and the Copper Solutions Defendants have not explained how it would. Accordingly, we conclude that the district court did not abuse its discretion in concluding that Rule 11-407 did not mandate that the Letter be excluded from evidence.

## C.      The District Court Did Not Abuse Its Discretion Under Rule 11-403 NMRA

**{24}**    Alderete argues that by admitting the Letter, the district court abused its discretion under Rule 11-403 because the risk of unfair prejudice outweighed the Letter's probative value. Rule 11-403, in relevant part, allows a district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" "Our courts have repeatedly recognized that the [district] court is in the best position to evaluate the effect of trial proceedings on the jury." *Norwest Bank N.M., N.A. v. Chrysler Corp.*, 1999-NMCA-070, ¶ 39, 127 N.M. 397, 981 P.2d 1215. "Accordingly, the [district] court is vested with broad discretion to determine under Rule 11-403 whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice[.]" *Williams v. BNSF Ry. Co.*, 2015-NMCA-109, ¶ 25, 359 P.3d 158 (internal quotation marks and citation omitted).

**{25}**    "The purpose of Rule 11-403 is not to guard against any prejudice whatsoever, but only against the danger of *unfair* prejudice." *Williams*, 2015-NMCA-109, ¶ 26 (internal quotation marks, and citation omitted). In the Rule 11-403 context, unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Stanley*, 2001-NMSC-037, ¶ 17, 131 N.M. 368, 37 P.3d 85 (internal quotation marks and citation omitted). Alderete contends that admitting the Letter posed a serious risk that the jury would base its decision on whether Medina's conduct was reckless on Alderete's "relatively uninformed surmise" rather than the other "copious evidence available to it[.]" We are not persuaded.

**{26}**    As Alderete concedes, the jury was presented a wealth of information, "including the testimony of the drivers involved, eyewitnesses, and no fewer than three accident

reconstruction experts[,]" that it could rely on in making its determination of whether Medina's conduct was reckless. Furthermore, Alderete had the opportunity to explain his "relatively uninformed surmise." Alderete testified that he was not a lawyer and that the word "reckless" was what was used in the police report. Alderete also explained that the Letter had not been reviewed by an attorney. Alderete further explained that, based on information he learned after writing the Letter, he might not have used the word "reckless" to describe Medina's conduct. Considering all of the evidence presented, including Alderete's explanation, we are not persuaded the admission of the Letter suggests that the jury's decision was made on an improper basis. Accordingly, we cannot say that the district court abused its discretion by declining to exclude this evidence under Rule 11-403.

### D.  The District Court Did Not Abuse Its Discretion Under Rule 11-704 NMRA

**{27}**  Lastly, Copper Solutions and Medina argue that the Letter was inadmissible because it used the word "reckless," which carries a "specialized legal meaning." They further argue that the Letter "essentially told the jury what result to reach, to the prejudice of the Copper Solutions Defendants." In making these arguments, they rely on federal precedent applying the federal counterpart of Rule 11-704. *See M.T. v. Saum*, 3 F. Supp. 3d 617, 626-27 (W.D. Ky. 2014). However, Copper Solutions and Medina do not cite to Rule 11-704 in their briefing nor do they identify the typical analysis applied by New Mexico's appellate courts when reviewing decisions under Rule 11-704 for abuse of discretion. *See Corona*, 2014-NMCA-071, ¶ 28 ("This Court has no duty to review an argument that is not adequately developed."). Nevertheless, as we explain below, we are not persuaded that *M.T.* requires us to conclude that the district court abused its discretion under Rule 11-704.

**{28}**  In *M.T.*, the federal district court explained that "[o]pinions that simply state a legal conclusion while not elucidating the facts are excludable under the [r]ules of [e]vidence." *M.T.*, 3 F. Supp. 3d at 626. Such a scenario is not presented here. As we discussed in the previous section, Alderete had the opportunity to explain the use of "reckless" in the Letter during his testimony. Alderete told the jury that he was not a lawyer, that the Letter was not reviewed by an attorney, and that the Letter used "reckless" because that was the word used on the police report. Alderete further explained that he might not have used "reckless" based on information he obtained after writing the Letter. Additionally, as explained in the preceding section, the admission of the Letter does not suggest that the jury's decision was made on an improper basis in light of Alderete's explanation and the wealth of other evidence presented at trial. Furthermore, we note that the Copper Solutions Defendants emphasized Alderete's explanations during closing arguments and reminded the jury that the Letter itself did not establish the legal standard for recklessness. For these reasons, we cannot say that the district court abused its discretion by declining to exclude this evidence pursuant to Rule 11-704.

### IV.  The Punitive Damage Awards Against Medina, Alderete, and Copper Solutions

**{29}** "To be liable for punitive damages, a wrongdoer must have some culpable mental state[.]" *Clay v. Ferrellgas, Inc.*, 1994-NMSC-080, ¶ 12, 118 N.M. 266, 881 P.2d 11. For each of the Copper Solutions Defendants, the jury was instructed that it could award punitive damages against them if their conduct was willful or reckless, which would demonstrate they acted with the requisite culpable mental state. *See* UJI 13-1827 NMRA. The jury was instructed that "[w]illful conduct is the intentional doing of an act with knowledge that harm may result." *Id.* As to reckless conduct, the jury was instructed that it "is the intentional doing of an act with utter indifference to the consequences. When there is a high risk of danger, conduct that breaches the duty of care is more likely to demonstrate recklessness." *Id.*

**{30}** On the special verdict form, the jury answered "yes" when asked whether "the conduct of Mr. Medina was willful or reckless" and awarded $3,000,000 in punitive damages against Medina. The jury also answered "yes" when asked whether "the conduct of Copper Solutions *or* Mr. Alderete [was] willful or reckless[.]" (Emphasis added.) The jury awarded $6,000,000 in punitive damages against "Copper Solutions *and* Mr. Alderete[.]" (Emphasis added.)

## A.    Standard of Review

**{31}** "We review the findings underlying the jury's award of punitive damages to determine whether those findings are supported by substantial evidence." *Helena Chem. Co. v. Uribe*, 2013-NMCA-017, ¶ 35, 293 P.3d 888 (alteration, internal quotation marks, and citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). In our review for substantial evidence, "[w]e resolve all disputed facts in favor of the jury's findings and indulge all reasonable inference[s] in favor of the verdict, while disregarding all inferences to the contrary." *Id.*

**{32}** To the extent that the Copper Solutions Defendants argue that the jury's punitive damages award is unreasonable or violates their constitutional due process rights, that "is a question of law which we review de novo." *Grassie v. Roswell Hosp. Corp.*, 2011-NMCA-024, ¶ 48, 150 N.M. 283, 258 P.3d 1075. "[H]owever, de novo review in this context is somewhat limited [as] we have not undertaken to ourselves determine the actual award of punitive damages." *Id.* (internal quotation marks and citation omitted). "[I]n the course of our review, any doubts we may have concerning the question of what appropriate damages may be in the abstract, or owing to the coldness of the record, should be resolved in favor of the jury verdict." *Id.* (internal quotation marks and citation omitted).

## B.    The Punitive Damages Award Against Medina Is Not Supported by Substantial Evidence

**{33}** Medina argues that the punitive damages award against him fails because there is nothing in the record that would allow the jury to conclude that his conduct was willful

or reckless. Having reviewed the evidence presented at trial, we agree and reverse the punitive damages award against Medina on that ground.

**{34}**　At trial, the jury heard testimony from a witness who was driving directly behind Medina immediately before the collision. That witness testified that immediately before the first collision Medina looked like he was going to pass another vehicle but returned to his lane, crossing over the white shoulder line while doing so. The witness further testified that Medina again left his lane, reentered his lane, and then "entered" the white shoulder line. The witness stated that he was on the phone with 911 to report Medina's driving when the first collision occurred. The witness did not see Medina apply his brakes before the first collision. The witness further testified that he thought Medina "was either dazed and confused or maybe even drunk or something." Despite the witness's thoughts on the matter, no evidence was presented Medina had been drinking or used drugs before the collisions; therefore, it would require impermissible speculation for the jury to conclude that he had.

**{35}**　Furthermore, contrary to Plaintiff's assertions, there was also insufficient evidence for the jury to conclude that Medina was fatigued. The evidence presented at trial showed that Medina had been off-duty for approximately eleven and one half hours when he began his shift on the morning of the collisions. The evidence also showed that Medina had been driving for approximately four or five hours before the collision. No evidence was presented to the jury that either of these activities was in violation of regulations concerning the number of consecutive hours commercial drivers are allowed to drive or the number of hours they must take off between shifts. Additionally, only one expert discussed whether there was evidence that Medina was fatigued. That expert did not identify any evidence that indicated fatigue, instead testifying that nothing in Medina's log books indicated fatigue.

**{36}**　In the absence of evidence of an intentional act on Medina's part that could demonstrate a culpable mental state, we have no basis upon which we can conclude that the punitive damages claim against Medina is supported by substantial evidence. *See Clay*, 1994-NMSC-080, ¶ 12 ("To be liable for punitive damages, a wrongdoer must have some culpable mental state[.]"); UJI 13-1827 (defining willful and reckless conduct). Accordingly, we reverse the punitive damages award entered against Medina. Because we reverse on this basis, we need not reach Medina's other challenges to the punitive damages award.

**{37}**　As a final point, we note that Plaintiff argues that his punitive damages claim against Medina can be sustained based on Medina's inspection of the semi-truck. We disagree, because "the conduct giving rise to the punitive damages claim must be the same conduct for which actual or compensatory damages were allowed." *Behrens v. Gateway Court, LLC*, 2013-NMCA-097, ¶ 24, 311 P.3d 822 (internal quotation marks and citation omitted). Here, Medina's liability for compensatory damages was based on the jury's conclusion that his following too closely and careless driving were a cause of Plaintiff's injuries and damages. Therefore, the jury could not base its punitive damages award on any evidence suggesting Medina insufficiently inspected his vehicle.

**C.      We Affirm the Punitive Damages Award Against Alderete and Copper Solutions**

**1.      The Punitive Damages Award Against Alderete and Copper Solutions Is Supported by Substantial Evidence**

**{38}**     Alderete and Copper Solutions argue that there was insufficient evidence for the jury to conclude that (1) there was a causal connection between their conduct and the collision, and (2) they acted with a culpable mental state. We disagree.

**{39}**     Here, the compensatory damages award against Alderete and Copper Solutions was based on the jury's finding that they were "negligent in their training and supervision of Mr. Medina[.]" Accordingly, we limit our analysis of the punitive damages award to that same conduct. *See id.* ¶ 24 ("[T]he conduct giving rise to the punitive damages claim must be the same conduct for which actual or compensatory damages were allowed." (internal quotation marks and citation omitted)). In our recitation of the relevant evidence, we are mindful of our standard of review. *See Helena Chem. Co.*, 2013-NMCA-017, ¶ 35 (stating that in our review for substantial evidence "[w]e resolve all disputed facts in favor of the jury's findings and indulge all reasonable inference[s] in favor of the verdict, while disregarding all inferences to the contrary").

**{40}**     At trial, Alderete stated that he had been the sole owner of Copper Solutions since 2001. Alderete testified that Copper Solutions uses a form from J.J. Keller & Associates titled "Checklist for Qualification of New Drivers." The checklist had lines to indicate when relevant documents concerning driver qualifications were requested, returned, and approved. Those documents included driving record checks, entry-level driver training certificates, and safety performance histories from previous employers. However, the checklist for Medina, which was entered into evidence, did not have any information entered on it besides his name and address. Furthermore, Alderete had not requested or received Medina's safety performance history from his previous employer despite Medina giving Copper Solutions the authority to do so. Nor had Alderete run any motor vehicle checks on Medina in any of the states in which Copper Solutions operates. Alderete admitted that it would be fair to say that Copper Solutions had not received any of the documents identified on the checklist for Medina. Furthermore, Alderete testified that they only ran driving record checks in Texas during Medina's employment with Copper Solutions despite Medina also driving in other states.

**{41}**     Alderete also testified that he hired someone to conduct the training for the entry-level driver training certificate for Medina. However, despite Medina having limited proficiency in English, the training was conducted in English. Alderete also confirmed that the quizzes for the training certificate were given to Medina in English, and Alderete was unsure whether it was he or another driver who translated it for Medina. Alderete stated that there were other drivers taking the quizzes at the same time as Medina. Alderete then admitted that having one of those drivers translate the quizzes could raise a question regarding whether Medina understood the questions and answers or whether the answers he gave were even his. Medina's entry-level driver training certificate was

dated February 23, 2012, over three months after the collision and over ten months after he was hired. Alderete did not identify or provide any documentation of any prior training Medina may have undergone with any previous companies.

**{42}** Based on the foregoing evidence, the jury could reasonably determine that Alderete's conduct with regard to Medina's training and supervision showed a willful and/or reckless disregard for his managerial responsibilities. We also note that the jury was instructed that "[a]s the risk of danger that should reasonably be foreseen increases, the amount of care also increases." To that point, the jury heard testimony that described State Road 529, on which Medina operated his semi-truck, as small, narrow, and especially busy in the mornings. Therefore, the jury also could have reasonably found that Alderete's disregard for his managerial responsibilities was so inadequate in light of the danger posed by operating a semi-truck on State Road 529 that it rose to the level of willfulness and/or recklessness. For these reasons, we conclude that there was sufficient evidence for the jury to conclude that Alderete acted with a culpable mental state sufficient to sustain punitive damages. For the following reasons, we reach the same conclusion as to Copper Solutions.

**{43}** New Mexico has a "general rule that punitive damages are not imposed on an employer for the acts of an employee as a matter of simple respondeat superior." *Grassie*, 2011-NMCA-024, ¶ 39. "Rather, there must be proof in some form of the employer's own culpable state of mind and conduct." *Id.* Our Supreme Court has explained that

> [a] corporation may be held liable for punitive damages for the misconduct of its employees if: (1) corporate employees possessing managerial capacity engage in conduct warranting punitive damages; (2) the corporation authorizes, ratifies, or participates in conduct that warrants punitive damages; or (3) under certain circumstances, the cumulative effects of the conduct of corporate employees demonstrate a culpable mental state warranting punitive damages.

*Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 21, 140 N.M. 478, 143 P.3d 717 (internal quotation marks and citations omitted). Here, Plaintiffs have proceeded under the third category. *See Clay*, 1994-NMSC-080, ¶ 16.

**{44}** In addition to Alderete's willful or reckless training and supervision of Medina, Alderete also testified that the conduct of another employee, his secretary or office manager, contributed to those failures. Alderete testified that it was the responsibility of his secretary or office manager to adequately keep the employee files and/or confirm that information was properly contained in the employee files. Furthermore, Alderete stated that it was his office manager who maintained the company's Department of Transportation information, including by reviewing manuals and attending webinars to ensure that Copper Solutions had current information. This testimony, especially when considered in conjunction with Alderete's conduct and the danger presented by operating a commercial vehicle on State Road 529, provided sufficient basis for the jury

to conclude that Copper Solutions' conduct with regard to Medina's training and supervision also showed a willful and/or reckless disregard for its managerial responsibilities.

**{45}** Finally, based on the evidence identified in this section and the testimony regarding Medina's improper driving, the jury could reasonably conclude that Alderete's and Copper Solutions' conduct in relation to Medina's training and supervision contributed to Medina's improper driving and was, therefore, causally related to the collisions. Accordingly, we conclude that the joint punitive damages award against Alderete and Copper Solutions is supported by substantial evidence.

**2.      We Are Not Persuaded That the Punitive Damages Award Against Alderete and Copper Solutions Is Unreasonable**

**{46}** Copper Solutions argues that even if we conclude that the punitive damages award was supported by substantial evidence, "the amount of punitive damages awarded . . . exceeds the limits imposed by substantive due process standards." In reviewing whether a punitive damages award is reasonable and comports with constitutional due process, we consider three criteria: (1) "the degree of reprehensibility of the defendant's misconduct"; (2) "the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award"; and (3) "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Aken v. Plains Elec. Generation & Transmission Coop., Inc.*, 2002-NMSC-021, ¶ 20, 132 N.M. 401, 49 P.3d 662. Of those criteria, "reprehensibility is the most important indicium of the reasonableness of a punitive damages award." *Grassie*, 2011-NMCA-024, ¶ 49 (internal quotation marks and citation omitted).

**{47}** Copper Solutions first argues that there is no evidence of conduct that can be reasonably characterized as "reprehensible" for the same reasons it argued that there was a lack of "willful" or "reckless" conduct. Specifically, it argues that there was only evidence of negligent conduct. Copper Solutions next argues that there is no causal link between its culpable conduct and Plaintiff's injuries. We rejected both of these arguments above and, therefore, do not further address them here. Outside of those arguments, Copper Solutions does not identify how the jury's award is unreasonable. Accordingly, we are not persuaded that the punitive damages award against Alderete and Copper Solutions is unreasonable.

**3.      Responsibility for the Punitive Damages Award Entered Against Alderete and Copper Solutions Is to Be Shared Jointly**

**{48}** After trial, Plaintiff and the Copper Solutions Defendants separately presented forms of judgment. Both of the submitted forms of judgment indicated Copper Solutions and Alderete were jointly liable for the $6,000,000 punitive damages award. At a hearing on the form of judgment, Plaintiff stated, "No one has ever suggested that we somehow get [$12,000,000] out of th[e jury's] determination of [$6,000,000]. It's for the

same money. Everybody understands that." However, the judgment entered by the district court appears to separately award $6,000,000 in punitive damages each against Alderete and Copper Solutions.

**{49}** In this appeal, Alderete argues that he can, at most, be jointly liable with Copper Solutions for the $6,000,000 punitive damage award. In response, Plaintiff agrees that Alderete and Copper Solutions are jointly liable for the jury's punitive damage. Accordingly, the joint status of the punitive damages award was not in dispute at the district court and is not in dispute in this appeal.[6] Because it is undisputed that liability for the $6,000,000 punitive award is to be shared jointly between Copper Solutions and Alderete, the district court shall reform the judgment accordingly on remand.

**CONCLUSION**

**{50}** For the foregoing reasons, we reverse the jury's punitive damages award as to Medina. On remand, the district court shall reform the judgment to make it clear that liability for the $6,000,000 punitive damages award is to be shared jointly by Copper Solutions and Alderete. We otherwise affirm.

**{51} IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**ZACHARY A. IVES, Judge**

---

6To the extent that Copper Solutions is arguing that imposition of joint liability on this punitive damage award is improper, we note that any error in this regard was invited error. First, this issue arose from the wording on the special verdict form that was submitted by the Copper Solutions Defendants and adopted by the district court. Second, the Copper Solutions Defendants submitted a form of judgment suggesting that the punitive damages award should be entered jointly between Alderete and Copper Solutions. Accordingly, we decline to further address this argument. *See Cordova v. Taos Ski Valley, Inc*., 1996-NMCA-009, ¶ 13, 121 N.M. 258, 910 P.2d 334 ("A party who has contributed, at least in part, to perceived shortcomings in a [district] court's ruling should hardly be heard to complain about those shortcomings on appeal.").